**Alan STEIN, individually and as a Director of the Salmon Bay Protective Association, Salmon Bay Protection Association, Edward P. Churchill, individually and as President of the Wrangell Cooperative Association, and the Wrangell Cooperative Association, Plaintiffs,**

v.

**Michael BARTON, in his official capacity as Regional Forester for the Alaska Region, F. Dale Robertson, in his official capacity as Chief of the United States Forest Service, Clayton Yeutter, in his official capacity as the Secretary of Agriculture, and the United States Forest Service, an agency within the U.S. Department of Agriculture, Defendants.**

and

**Ketchikan Pulp Company, Intervenor–Defendant.**

No. J89–016 Civ.

United States District Court, D. Alaska.

March 7, 1990.

Robert E. Lindekugel, Juneau, Alaska, for plaintiffs.

Bruce M. Landon, Land & Natural Resources Div., Dept. of Justice, Anchorage, Alaska, for defendants.

Will Woodell, Ziegler, Cloudy, King & Peterson, Ketchikan, Alaska, for intervenor-defendant.

## MEMORANDUM OPINION

VON DER HEYDT, District Judge.

### I. INTRODUCTION.

THIS CAUSE comes before the court pursuant to the Order and Preliminary Injunction entered March 1, 1990. By that order, the court granted in part the motion for preliminary injunction filed August 31, 1989 (Docket No. 2) by plaintiffs Stein et al., denied the motion to dismiss filed September 1, 1989 (Docket No. 7) by intervenor defendant Ketchikan Pulp Company (KPC), and denied without prejudice plaintiffs' motion to supplement preliminary injunction filed February 5, 1990 (Docket No. 80). Plaintiffs' claims fall within the court's federal question jurisdiction. 28 U.S.C. § 1331. The reasons for the court's decision are set forth below.

### II. BACKGROUND.

In 1951, the United States Forest Service (Service) signed a long-term timber sale contract with Ketchikan Pulp Company (KPC) providing for logging of more than 8.25 billion board feet of timber over a fifty-year period in an area of the Tongass National Forest in southeastern Alaska, including Prince of Wales, Revilla, and Heceta Islands (primary sale area). Since 1964, planning has been divided into five-year operating periods. The Forest Service prepared a Final Environmental Impact Statement for the 1989–94 Operating Period for the Ketchikan Pulp Company Long–Term Sale Area (FEIS), and in a Record of Decision (ROD) dated June 2, 1989, the Regional Forester adopted the latest five-year operating plan for the sale area (Plan).

On August 30, 1989, plaintiffs, commercial fishermen and subsistence resource users, brought suit in this court against several federal government officials (federal defendants) claiming that the FEIS and the ROD adopting the Plan violate the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3101 et seq., the Clean Water Act (CWA), 33 U.S.C. § 1313, and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (D). Plaintiffs seek injunctive and declaratory relief.

On September 29, 1989, the court granted KPC's motion to intervene as a defendant (Docket No. 25) and entered a temporary restraining order enjoining the federal defendants from authorizing logging or road building within 100 feet of certain streams and tributaries within the sale area (Docket No. 26). Federal defendants filed their notice of lodging of administrative record on November 1, 1989 (Docket No. 62). On January 8, 1990 (Docket No. 77), upon consent of the parties, the TRO

was extended until February 28, 1990 to preserve the status quo pending further settlement negotiations. As of this date, the parties have been unable to reach settlement.

III. PLAINTIFFS' MOTION TO SUPPLEMENT.

■ Plaintiffs' motion to supplement is denied without prejudice. The court heard oral argument on plaintiffs' motion for preliminary injunction on October 11, 1989, at which time plaintiffs' motion was deemed submitted. Plaintiffs may seek the court's consideration of the supplemental materials when the court considers plaintiffs' claims for permanent relief.

IV. KPC'S MOTION TO DISMISS.

■ KPC's motion to dismiss is denied. The court in granting plaintiffs' earlier request for a temporary restraining order determined that judicial intervention was warranted to protect plaintiffs from irreparable injury. Requiring exhaustion of administrative remedies in these circumstances would be inappropriate. *Southeast Alaska Conservation Council v. Watson*, 697 F.2d 1305, 1309 (9th Cir.1983). The court further holds that Section 314 of P.L. 100–446, Title III, does not apply to bar plaintiffs' challenges to the site-specific 1989–94 FEIS.

V. PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION.

A. *National Environmental Policy Act and Administrative Procedure Act Claims.*

Plaintiffs contend that the FEIS prepared by the Forest Service and the Service's choice of mitigation options are invalid for several reasons under NEPA and the APA. The court will consider these arguments seriatim.

1. JUDICIAL REVIEW OF ENVIRONMENTAL IMPACT STATEMENTS.

"Section 101 of NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 1844, 104 L.Ed.2d 351 (1989) (discussing 42 U.S.C. § 4331). In furtherance of this goal, NEPA prescribes "a set of 'action-forcing' procedures that require [federal agencies to] take a 'hard look' at [the] environmental consequences [of their actions] and that provide for broad dissemination of relevant environmental information." *Id.* 109 S.Ct. at 1846 (citations omitted). Section 102 of NEPA obligates federal agencies to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement on ... the environmental impact of the proposed action...." *Id.* at 1845 (quoting 42 U.S.C. § 4332(C)(i)).

The EIS requirement:

serves two ends. A properly prepared EIS ensures that federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental consequences, and it provides the public with information on the environmental impact of a proposed action and encourages public participation in the development of that information.

*Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987) (citation omitted); *see also Methow Valley*, 109 S.Ct. at 1845.

NEPA's procedural requirements promote the national interest in environmental protection by "ensur[ing] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Methow Valley*, 109 S.Ct. at 1845 (citation omitted). Further, "the strong precatory language of § 101 of the Act and the requirement that agencies prepare detailed impact statements inevitably bring pressure to bear on agencies 'to respond to the needs of environmental quality.'" *Id.* (quoting remarks of Sen. Muskie, 115 Cong.Rec. 40425 (1969)). However, while these procedures:

are almost certain to affect the agency's substantive decision, it is now well set-

tled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.... Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action.

*Id.* at 1846 (citations and footnote omitted).

■ District court review of the adequacy of an EIS principally is governed by the APA, which provides that agency actions, findings, and conclusions may be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if undertaken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D). *City of Angoon v. Hodel,* 803 F.2d 1016, 1020 (9th Cir.1986), *cert. denied,* 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987); *Oregon Environmental Council,* 817 F.2d at 492.[1] "The Council on Environmental Quality's ('CEQ') regulations govern the form, content, and preparation of an EIS." *Oregon Environmental Council,* 817 F.2d at 492 (citing 40 C.F.R. §§ 1500–1508 (1986)). In this circuit, courts employ a "rule of reason" which requires that an EIS contain a reasonably thorough discussion of the significant aspects of the probable environmental consequences of the action. *Id.* (citations omitted). The district court must make "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decisionmaking and informed public participation." *Id.* (citations omitted). The reviewing court may not "fly speck" an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies. *Id.* (citations omitted). However, an EIS may be found inadequate under NEPA if it does not reasonably set

forth sufficient information to enable the decision maker to consider the environmental factors and make a reasoned decision. *Id.* at 493 (citations omitted).

## 2. RANGE OF ALTERNATIVES CONSIDERED.

In the FEIS, the Forest Service considered a "no action" alternative and several project alternatives. All the action alternatives meet the Service's underlying planning objective of providing KPC with 950 million board feet of timber within the five-year period. Plaintiffs contend that the Forest Service violated NEPA, 42 U.S.C. § 4332(2)(E), and the Service's own regulations, 36 C.F.R. § 219.12(f)(4), by failing to consider alternatives that compromise this planning objective in light of competing interests in the resources involved.

■ The court disagrees. Plaintiffs' NEPA argument is contrary to clear precedent and plaintiffs' regulatory argument is unsupported by authority. NEPA does not require a federal agency to consider alternatives which do not achieve the purpose contemplated for the proposed action, and NEPA does not circumscribe the agency's discretion in designating the project's purpose. *Angoon,* 803 F.2d at 1021. NEPA only requires a federal agency to describe "those alternatives necessary to permit a 'reasoned choice.'" *Id.* at 1020 (quoting *California v. Block,* 690 F.2d 753, 767 (9th Cir.1982)). The Forest Service has complied with this requirement here.

## 3. SITE–SPECIFICITY REQUIREMENTS.

■ Plaintiffs raise a formal objection to the site-specificity of the FEIS. Plaintiffs contend that the manner in which information is presented in the FEIS leaves them "mystified" as to what specific activities

---

**1.** *Compare Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989) (judicial review of agency decision not to supplement an EIS is appropriate under the "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), but not under the "in accordance with law" clause of § 706(2)(A) or the "without observance of procedure required by law" provision of § 706(2)(D)).

are planned and what their probable impacts will be.[2]

NEPA requires that an EIS include: "a detailed statement," 42 U.S.C. § 4332(2)(C), sufficient "to give to decision makers ... removed from the initial decision sufficient data from which to draw their own conclusions." The specificity that NEPA requires of an EIS is independent of the scope of the EIS. *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407 (9th Cir.1985) (*Tenakee I*) (citations omitted). A site-specific EIS must contain a reasonably thorough discussion of the distinguishing characteristics and unique attributes of each area affected by the proposed action. *California v. Block*, 690 F.2d 753, 761–64 (9th Cir.1982). Proposed activities must be sufficiently correlated with environmental factors in each affected area to facilitate public discussion of the project; this may be accomplished by supplementing generic discussions of environmental values with text or maps showing how relevant considerations were or were not factored into planning decisions. *City of Tenakee Springs v. Courtright*, No. J86–024 Civ., slip op. at 10 (D.Alas. June 26, 1987) (*Tenakee II*).

■ To the extent plaintiffs object generally to the level of detail and form of presentation of information in the FEIS, their objections constitute unwarranted "fly-specking." The nine-volume FEIS employs a combination of annotated topographic maps, textual, and tabular data to describe the project alternatives and their impacts on cognizable values within the affected areas. As a general rule, such presentation is permissible under NEPA.

■ Plaintiffs' site-specificity objection to the disclosure of harvesting plans for each area is also unfounded. Plaintiffs object that they cannot determine from the FEIS "where, when, and how logging and roading activities will occur on the 812,477

acres of land."[3] The FEIS contains comprehensive, detailed quantitative and qualitative descriptions of the logging and roading plans for each harvest unit. The only details that the FEIS does not disclose are exact timetables and locations on the ground for planned harvesting activities in each harvest unit. This, however, is because the Forest Service does not develop these details at the pre-implementation stage.[4]

Implicit in plaintiffs' site-specificity objection is the more basic contention that NEPA requires the Forest Service to *formulate* its plans in greater detail before evaluating site-specific impacts. To prevail on such a claim, plaintiffs must show why disclosure of more details regarding site-specific impacts is necessary in order to "foster both informed decision-making and informed public participation." *Oregon Environmental Council*, 817 F.2d at 492. Plaintiffs have not even attempted such a showing except with respect to mitigation of impacts on fisheries, which the court will address below. In all other respects, plaintiffs have failed to show why NEPA requires more detail in a site-specific EIS.

### 4. MITIGATION EVALUATION.

■ Plaintiffs most strenuous objection to the site-specificity of the FEIS appears to the court actually to be a substantive challenge to the fisheries impact mitigation analysis contained therein. Indeed, mitigation seems to be the central issue in plaintiffs' complaint.

Riparian timber harvesting can pose a significant threat to anadromous fish populations that depend upon affected streams for habitat.[5] Logging can have deleterious impacts on fish by altering natural temperature regimes and channel stability, aggravating bank erosion and sedimentation, and depleting winter cover and large woody

---

**2.** Plaintiffs' memorandum in support (Docket No. 4) at 18.

**3.** Plaintiffs' memorandum (Docket No. 4) at 15.

**4.** Throughout this opinion, the term "harvesting" is used to refer to all activities generally

associated with timber harvesting, including tree felling, yarding, road construction, and stream crossings.

**5.** 1 FEIS 4–127–28.

debris.[6] In 1988, the National Marine Fisheries Service (NMFS) recommended that the Forest Service protect fish habitats from these deleterious impacts by prohibiting logging within 30–meters (approximately 100 feet) of all anadromous fish streams and their tributaries in Alaska.[7]

The Forest Service considered several options for mitigating impacts on fisheries. The Service delineated streams and their associated riparian zones within the sale area as aquatic habitat management units (AHMU), and classified them as class I (anadromous or high value resident sport fish habitat), class II (resident sport fish habitat), or class III (influence downstream fish habitat).[8] The Service considered and rejected one mitigation alternative, option C, that is somewhat analogous to the NMFS recommendation.[9] Option C provides for uniform 100–foot no-cut buffer zones adjacent to Class I streams, 25–foot buffers along Class II streams, and no buffers along Class III streams.[10]

Unlike option C, which for the most part calls for uniform application of specified mitigation measures according to fixed formulae identified in the FEIS, the selected alternative, option B, utilizes a "highly variable streamside management prescription" providing a minimum 25–foot buffer on all class I and II streams and no minimum buffer on class III streams.[11] For option B, the FEIS lists and briefly describes various possible measures for achieving enumerated mitigation objectives and indicates to which types of landforms each measure might apply.[12] Fishery impact considerations and mitigation objectives for each AHMU are categorized generically in an appendix to the FEIS.[13]

Under option B, specific mitigation plans for particular AHMUs are not identified or evaluated in the FEIS. Instead, this option contemplates that specific plans will be designed on an ad hoc basis by Forest Service experts when harvesting actually commences in a given unit:

[F]ield inspection is made, with few exceptions, on each unit ... usually ... in conjunction with the pre-sale foresters when they are laying out the boundaries of the [harvest] unit. At this time, the fish biologist identifies streams within and adjacent to the unit as to class and channel type.... [T]he fish biologist then determines what mitigation measures, including the designation of buffer areas of standing timber, are required to meet the objectives established in the FEIS. These mitigation measures closely follow those recommended in the FEIS but are usually modified to ensure that the appropriate objectives are met.... The pre-sale forester is also coordinated with to determine feasibility of specific mitigation measures so as to ensure that the recommended and laid out measures can reasonably be expected to be accomplished.[14]

Because the Service does not formulate specific mitigation measures for individual AHMUs at the pre-implementation stage, a concerned reader cannot discern from the FEIS exactly which specific measures will be employed to mitigate impacts on fish habitat in a given AHMU. For this reason, plaintiffs argue that the FEIS is inadequately site-specific and fails adequately to identify and evaluate mitigation measures.

Two recent Supreme Court decisions have worked some revision in the standard

---

**6.** *Id.*

**7.** NMFS Alaska Region Policy, Ex. 20, plaintiffs' memo (Docket No. 4).

**8.** 1 FEIS 3–85.

**9.** Fisheries mitigation option C is incorporated in project alternative 6, which was not selected by the Service for implementation. 1 FEIS 2–145.

**10.** 1 FEIS 2–157.

**11.** 1 FEIS 2–152, –157–62, –165. Fisheries mitigation option B is incorporated in project alternative 7, which was selected by the Service for implementation. 1 FEIS 2–145.

**12.** 1 FEIS 2–151–56, –169–72.

**13.** Appendix N, 6 FEIS N–139–96.

**14.** Declaration of Ronald Hugh Wiley, Ex. 6, federal defendants' opposition (Docket No. 27) at 3–4.

applied in this circuit when reviewing agency treatment of mitigation analysis in an EIS. In *Methow Valley Citizens Council v. Regional Forester,* 833 F.2d 810 (9th Cir.1987), *rev'd,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), the Court of Appeals for the Ninth Circuit invalidated an EIS prepared by the Forest Service on grounds, inter alia, that the EIS failed adequately to discuss mitigation measures. *Id.* at 820. In evaluating the project at issue in that case, the Forest Service had concluded that third party activities resulting not directly from the project but as its foreseeable consequence would cause "excessive adverse impacts" on air quality unless the third parties took measures to mitigate those impacts. *Id.* at 818–19. The Forest Service approved the project anyway, and directed that a mitigation plan be developed. *Id.* at 818. The court of appeals held that NEPA requires that "action be taken to mitigate the adverse effects of major federal actions," and invalidated the EIS because instead of "contain[ing] a detailed explanation of the specific measures which will be employed to mitigate the adverse impacts," it only "enumerate[d] possible mitigation measures and identif[ied] mitigation goals ... in very general terms, lacking both ... detailed description ... and any analysis as to the effectiveness of these measures." *Id.* at 819 (citation omitted).

The Supreme Court reversed, rejecting the notions that NEPA contains "substantive requirement[s]" that "action be taken to mitigate the adverse effects of major federal actions" or "that a complete mitigation plan be actually formulated and adopted." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 1847, 104 L.Ed.2d 351 (1989) (citation omitted), *rev'g,* 833 F.2d 810 (9th Cir.1987). The Court acknowledged that the severity of adverse effects cannot properly be evaluated without consideration of potential

mitigation, and reaffirmed that NEPA implicitly requires federal agencies to consider mitigation measures and discuss them in an EIS. *Id.* 109 S.Ct. at 1846–47 (discussing 42 U.S.C. § 4332(C)(ii)). The Court concluded, however, that an EIS need not include "a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action," *id.* at 1847 (citation omitted; original emphasis), but rather only a "reasonably complete discussion of *possible* mitigation measures ... discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Id.* at 1846–47 (emphasis added).[15]

In the instant case, the court finds that the FEIS discusses *possible* measures to mitigate fisheries impacts in each AHMU in sufficient detail to ensure that the Service fairly evaluated environmental consequences of timber harvesting in each area. Plaintiffs' objection that a concerned reader cannot discern from the FEIS what specific measures *will* be employed to mitigate impacts on fish habitat in a given AHMU, while correct, is unavailing. NEPA, by itself, does not require such a disclosure. *Methow Valley,* 109 S.Ct. at 1847.

### 5. DECISION TO ADOPT MITIGATION OPTION B.

Plaintiffs argue that the Forest Service's decision to adopt option B should be set aside for several reasons. Plaintiffs contend that the evaluation in the FEIS of impacts on fisheries under the chosen alternative is flawed. Plaintiffs further contend that the Forest Service's conclusion regarding the efficacy of mitigation option B does not follow from the facts.

Forest Service policy on fisheries impact mitigation provides "that the biological productivity of fish streams will be protected in all allocation and management deci-

---

**15.** *See also Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (reversing for the same reasons a Ninth Circuit decision in which the court of appeals noted, "We fail to see how mitigation measures can be properly analyzed and their effectiveness explained when they have yet to be developed," and invalidated an EIS because the agency failed to formulate and evaluate the effectiveness of measures the agency and others would take to mitigate direct impacts of the approved project. 832 F.2d 1489, 1493 (9th Cir. 1987)).

sions." [16] The considerations underlying the Service's decision to adopt option B are evidenced in statements scattered throughout the FEIS:

> Without streamside management prescriptions or post harvest mitigation, longer term changes may cause stream system specific declines in fish species.[17] ... The Mitigation Measures for fisheries are designed to avoid most short-term damage, and provide for the long-term productivity of fish streams.[18] ... All the [mitigation measures] are designed to prevent degradation of fish habitat and fish capability.... There is, however, a range of risk associated with the application of the [mitigation measures] that do not exist under natural conditions.[19] [P]rotection of [fish] habitats is usually in direct conflict with timber harvest operations, unless these areas are contained in no-cut zones.... When these areas are contained in no-cut zones the risk is low. When these areas are contained in portions of the harvest unit the risk is higher.[20] ... [Under option C,] [o]verall watershed disturbance and sedimentation ... would be low [and representative fish species] capability should be fully maintained. [T]here should be no reduction in ... capability from the planned activities.[21] [Under option B,] [o]verall watershed disturbance and sedimentation from harvest activities ... carries a higher than average risk [and representative fish species] capability ... would have a moderate risk.[22]

Despite the heightened risk of adverse fisheries impacts posed by option B, the Service adopted it in the chosen project alternative, concluding that "effective and consistent application of these measures will prevent any significant reduction in fish habitat capability" and "should provide for full protection of [fish] habitats." [23]

The court notes at the outset that NEPA itself does not prohibit a federal agency from choosing a project alternative that poses a heightened level of risk of adverse environmental impacts. *Methow Valley*, 109 S.Ct. at 1846. However, a district court reviewing such a choice must ensure that the agency's actions, findings, and conclusions are not arbitrary and capricious within the meaning of the APA, 5 U.S.C. § 706(2)(A). *Angoon*, 803 F.2d at 1020; *Oregon Environmental Council*, 817 F.2d at 492. In *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, the Supreme Court declared:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given." We will, however, "uphold a decision of less

16. 1 FEIS 2–163.

17. 1 FEIS 4–128.

18. 1 FEIS 2–145.

19. 1 FEIS 4–123.

20. 1 FEIS 4–156.

21. 1 FEIS 2–167; 4–148.

22. 1 FEIS 2–166; 4–148; 4–158.

23. 1 FEIS 4–123, –156.

than ideal clarity if the agency's path may reasonably be discerned."

463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (citations omitted).

The court is limited with respect to the materials it may consider when reviewing actions taken by agencies pursuant to the informal rulemaking procedures of section 553 of the APA, 5 U.S.C. § 553:

> [T]rial court review of agency decision-making is generally limited to the existing administrative record. This record may be supplemented with testimony from the officials who participated in the decision explaining their action or by formal findings prepared by the agency explaining its decision.

*Kunaknana v. Clark*, 742 F.2d 1145, 1152 (9th Cir.1984) (citations omitted). Supplemental information "should be explanatory in nature, rather than a new rationalization of the agency's decision, and must be sustained by the record." *Id.* at 1149 (citation omitted). Generally, extrarecord evidence may not be admitted to challenge the scientific validity of an agency's decision unless it shows "that the Agency proceeded upon assumptions that were entirely fictional or utterly without scientific support," *Ass'n of Pacific Fisheries v. Environmental Protection Agency*, 615 F.2d 794, 812 (9th Cir. 1980) (citation omitted), or to show that the agency failed to consider all the relevant factors. *Kunaknana*, 742 F.2d at 1152.

▆ In support of their motion, plaintiffs have produced numerous letters, memoranda, and reports documenting concerns of officials and experts of the Forest Service and the Alaska Department of Fish and Game regarding the efficacy of the Service's highly variable streamside management prescription.[24] These documents suggest that mitigation efforts

have been hampered by three problems: (1) significant flaws in the mitigation plans designed by field biologists for implementation on the ground in individual AHMUs; (2) substantial deviations from field mitigation plans by work crews; and (3) inadequate mechanisms for monitoring the efficacy of mitigation measures in the field. The documents further suggest that these problems have caused and continue to cause adverse fisheries impacts and extensive fish kills.[25]

Plaintiffs' evidence is facially persuasive, and raises a strong inference that the Forest Service erred when it determined that "effective and consistent application" of option B mitigation measures "will prevent any significant reduction in fish habitat capability."[26] If this information was available to the Service when it prepared the FEIS and the Service failed to consider it, its decision to adopt option B is arbitrary and capricious within the meaning of the APA and should be set aside for failure to consider "the relevant factors" or "an important aspect of the problem." *See Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2866–67. If the information was considered by the Service but discounted in its determination about the efficacy of mitigation option B, then the Service's decision *may* have to be set aside because the FEIS fails to establish a "rational connection between the facts found and the choice made" or because the Service's conclusion is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Although it is not entirely clear to the court, it appears that the Service was aware of the problems identified in the documents proffered by plaintiffs in sup-

---

**24.** It is not clear at this juncture whether some or all of these materials constitute extrarecord evidence. However, for reasons set forth below, the court finds that this evidence would in any case be admissible as relevant to the questions whether the Service considered all the relevant factors, *Kunaknana*, 742 F.2d at 1152, and whether the Service proceeded upon assumptions that are entirely fictional or utterly without scientific support, *Ass'n of Pacific Fisheries*, 615 F.2d at 812, in determining that "effec-

tive and consistent application" of option B mitigation measures "will prevent any significant reduction in fish habitat capability." 1 FEIS 4–123, –156.

**25.** *See, e.g.,* plaintiffs' exhibits cited in plaintiffs' memorandum (Docket No. 4) at 8–9, 20–21, 28, 30, 33–35.

**26.** 1 FEIS 4–123, –156.

port of their motion. The FEIS acknowledges past mitigation failures but concludes that they will not persist in the future:

> [As of 1988, the cumulative effect of past and present harvest activities] has significantly reduced coho habitat capability on some streams. Pink salmon habitat capability has been somewhat reduced in areas of unstable gravels and in the temperature sensitive AHMU's. Pink and coho capabilities have been impacted from the effects of roading. Overall, fish capability has been reduced from pre-harvest levels.[27] [C]oho habitat capability will continue to decline in some areas, as a result of past actions, while these same impacts will be avoided in the future.[28] ... Recent activities would not have a significant impact on coho habitat.[29] ... Coho habitat capability would be maintained under all present and future activities.... [30]

The FEIS gives no reasons for the Service's optimism. In their memorandum in opposition to plaintiffs' motion, however, the federal defendants argue that "the stricter monitoring and enforcement provisions in the EIS, the ROD and its addendum ... make past experience a poor indicator of future occurrences." [31]

Even if the court assumes, for the sake of argument, that the federal defendants' rejoinder is true, the FEIS does not articulate and explain this proposition sufficiently to withstand review under the "arbitrary and capricious" standard. The "elaborate monitoring plan" alluded to by the federal defendants in their opposition,[32] is given only cursory treatment in the FEIS. The FEIS states, "All action alternatives are subject to monitoring and reporting requirements contained in Forest Service manuals and handbooks. The monitoring requirements will be part of the implementation for all of the alternatives." [33] This vague declaration is supplemented by one short table entry explaining that the program for monitoring fisheries mitigation will be implemented by district rangers, who will measure the percent effectiveness of mitigation measures in five to fifteen percent of harvested units annually and who will record their findings on a form which is exemplified at the back of the table.[34] This explanation of mitigation monitoring is wholly insufficient to rebut the inferences raised by plaintiffs' evidence.

It is true that NEPA does not require an agency to mitigate adverse environmental impacts. However, where an agency's decision to proceed with a project is based on unconsidered, irrational, or inadequately explained assumptions about the efficacy of mitigation measures, the decision must be set aside as "arbitrary and capricious." The court concludes that plaintiffs have shown a likelihood of success on the merits of their claim that the Forest Service's decision to adopt option B should be set aside for this reason.

### 6. SUPPLEMENTATION OF THE FEIS.

If the Service was not aware of the mitigation problems identified in plaintiffs' documents when the FEIS was prepared, a different issue arise. The Service may be required under NEPA to prepare a post-decision supplemental environmental impact statement.

The Supreme Court recently considered this question in its decision in *Oregon Natural Resources Council.* The Court noted that CEQ regulations:

> which ... are entitled to substantial deference, impose a duty on all federal agencies to prepare supplements to ... EIS's if there "are significant new cir-

---

**27.** 1 FEIS 4–162–64.

**28.** 1 FEIS 4–187.

**29.** 1 FEIS 4–165.

**30.** 1 FEIS 4–186.

**31.** Federal defendants' opposition (Docket No. 27) at 18.

**32.** *Id.* at 21.

**33.** 1 FEIS 2–207.

**34.** 1 FEIS 2–212, –217.

cumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

109 S.Ct. at 1858 (citations and footnote omitted; discussing 40 C.F.R. § 1502.9(c) (1987)). An agency's determination whether to prepare a supplemental EIS in light of new information is governed by a "rule of reason," which requires supplementation whenever there remains major federal action to occur which the new information shows will affect the quality of the human environment in a significant manner or to a significant extent not already considered. *Id.* at 1859.

The Court in *Oregon Natural Resources Council* rejected the "reasonableness" standard of review employed by Ninth Circuit courts when reviewing agency decisions not to supplement an EIS in light of new information, and clarified that a reviewing court should defer to an agency decision not to supplement unless that decision fails to withstand scrutiny under the deferential "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A). *Id.* at 1860–61, 1861 n. 23. The Court noted that reviewing courts should not automatically defer to the agency "without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance— of the new information." *Id.* at 1861. The Court further noted that the agency's duty to take a "hard look" at the proffered evidence is not discharged unless the agency "carefully scrutinize[s] the proffered information" and determines "based on careful scientific analysis" that supplementation is unnecessary. *Id.* at 1864–65.

In the instant case, if the Service demonstrates it was unaware of plaintiffs' information when it prepared the FEIS, the court will remand to the agency for an initial determination whether plaintiffs' information warrants plenary consideration in a supplemental EIS. The court will expect the Service to take the requisite "hard look" at plaintiffs' information, however,

and to provide a reasoned explanation for its determination.

### B. *Clean Water Act Claims.*

In their opposition to plaintiffs' motion, federal defendants' argue that plaintiffs' Clean Water Act claims fail to state a claim upon which relief can be granted.[35] The court finds federal defendants' argument well-taken. Plaintiffs have had opportunity for rebuttal in their reply brief. Accordingly, plaintiffs' Clean Water Act claims are dismissed without prejudice. Fed.R. Civ.P. 12(b)(6).

### C. *Alaska National Interest Lands Conservation Act Claims.*

As explained below, the court finds that plaintiffs are entitled to a grant of preliminary injunctive relief on the basis of their NEPA claims. Accordingly, the court finds it unnecessary at this time to decide plaintiffs' likelihood of success on the merits of their ANILCA claims. These claims will be considered in the context of plaintiffs' request for declaratory relief.

### D. *Preliminary Injunctive Relief.*

 "[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (citations omitted); *see also Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987); *Save the Yaak Committee v. Block,* 840 F.2d 714, 722 (9th Cir.1988). Even where the plaintiff establishes both elements, however, injunctive relief has never been regarded as strictly a matter of right. *Romero–Barcelo,* 456 U.S. at 312, 102 S.Ct. at 1803. Where plaintiff and defendant present competing claims of injury, the function of equity is to "balanc[e] the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." *Id.* (quoting *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944)).

---

**35.** Opposition (Docket No. 27) at 42–46.

Further, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (citation omitted).

"The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Gambell*, 480 U.S. at 546 n. 12, 107 S.Ct. at 1404 n. 12 (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 392, 101 S.Ct. 1830, 1832, 68 L.Ed.2d 175 (1981)). Accordingly, the court must consider four factors when determining whether a plaintiff is entitled to interlocutory injunctive relief:

(1) the likelihood of plaintiff's success on the merits; (2) the possibility of plaintiff's suffering irreparable injury if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by the provision of preliminary relief.

*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir. 1987) (citations omitted).

The Ninth Circuit has noted that the public interest "is but one more interest to be balanced along with the interests of the parties." *State of Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1388–89 (9th Cir.1988) (citations omitted). Thus, where the public interest is implicated by plaintiff's claim for injunctive relief, "there are essentially two factors to be considered: The likelihood of the plaintiff's success on the merits; and, the relative balance of potential hardships to the plaintiff, defendant, and public." *Id.* (citations omitted).

To obtain a preliminary injunction, the moving party must show:

either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. Under either formulation, the moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury.

*Big Country Foods, Inc. v. Bd. of Educ. of Anchorage School District*, 868 F.2d 1085, 1088 (9th Cir.1989) (citations omitted).

The primary purpose of interlocutory injunctive relief "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Camenisch*, 451 U.S. at 395, 101 S.Ct. at 1834 (discussing preliminary injunctions).

Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*Id.* (citations omitted).[36]

Where the plaintiff complains that the defendant has violated a federal statute, a question arises whether the court retains its traditional equitable discretion to balance the interests of the parties and the public in determining whether to grant injunctive relief. "Congress may intervene and guide or control the exercise of the court's discretion...." *Romero–Barcelo*, 456 U.S. at 313, 102 S.Ct. at 1803 (citation omitted); *Gambell*, 480 U.S. at 540–42, 107 S.Ct. at 1402. However:

preserve existing conditions while determining its own authority to grant injunctive relief, even where the likelihood of plaintiff's success is unclear).

---

**36.** *See also Native Village of Venetie*, 856 F.2d at 1387–87 (citing *United States v. United Mine Workers of America*, 330 U.S. 258, 293, 67 S.Ct. 677, 695, 91 L.Ed. 884 (1947), for the proposition that the district court has the power to

The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances.... "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's equity jurisdiction, the full scope of that jurisdiction is to be recognized and applied."

*Romero–Barcelo*, 456 U.S. at 313, 102 S.Ct. at 1803–04 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946); other citations omitted); *see also Gambell*, 480 U.S. at 540–44, 107 S.Ct. at 1402–03. "There is nothing in NEPA to indicate that Congress intended to limit this court's equitable discretion." *Save the Yaak Committee v. Block*, 840 F.2d 714, 722 (9th Cir.1988).

At this juncture, it appears probable that plaintiffs will succeed on the merits of their claim that the Service's decision to adopt alternative 7 must be set aside as "arbitrary and capricious" because that decision is based on unconsidered, irrational, or inadequately explained assumptions about the efficacy of mitigation option B. Further, plaintiffs have shown a substantial likelihood of significant, long-term losses of anadromous fish habitat and populations if harvesting in affected AHMUs is subject only to the mitigation measures prescribed under option B. Against the hardship that would result for plaintiffs if injunctive relief were withheld, the court must balance the economic hardship that would result for those involved in logging in the sale area if injunctive relief were granted. The court has considered the arguments raised by intervenor defendant KPC and by the federal defendants. While it is never easy to balance such competing interests, the court readily concludes in this case that the balance tips sharply in favor of injunction:

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Gambell*, 480 U.S. at 544–46, 107 S.Ct. at 1404; *see also People ex rel. Van de Kamp v. Marsh*, 687 F.Supp. 495, 501 (N.D. Cal.1988) (pecuniary injury generally not an adequate basis for denying injunctive relief where plaintiffs show a sufficient likelihood of environmental injury); *People ex rel. Van de Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1316, 1319 (9th Cir.1985). Here, the likelihood and extent of environmental injury is substantial. While the likelihood and extent of economic injury is not insignificant, the court can mitigate it by narrowly tailoring the preliminary injunction to preserve the environmental status quo pending final disposition of plaintiffs' claims. The court finds that the public interest will best be served by entry of a preliminary injunction.

## VI. CONCLUSION.

The parties are invited to file within thirty days appropriate motions for summary adjudication of the issues preserved for final determination by this memorandum opinion and by the Order and Preliminary Injunction entered March 1, 1990.