**KLAMATH SISKIYOU WILDLANDS CENTER, Klamath Forest Alliance, and Native Plant Society of Oregon, Plaintiffs,**

v.

**Bruce BABBITT, Secretary of the Department of the Interior, Defendant.**

**No. CV99–1044–ST.**

United States District Court, D. Oregon.

June 12, 2000.

## OPINION AND ORDER

STEWART, United States Magistrate Judge.

### *INTRODUCTION*

Plaintiffs, Klamath Siskiyou Wildlands Center, Klamath Forest Alliance, and Native Plant Society of Oregon, filed two separate cases alleging that defendant, Bruce Babbitt, Secretary of the Department of the Interior ("Secretary"), violated the Endangered Species Act, 16 USC §§ 1531–1544 ("ESA"), by failing to publish in the Federal Register final rules for one butterfly species and five plant species within the one year deadline mandated by 16 USC § 1533(b)(6)(A). In October 1999, plaintiffs filed Motions for Summary Judgment, seeking injunctive and declaratory relief. The two cases were consolidated by Order dated November 24, 1999. At oral argument on December 6, 1999, the Secretary raised a question as to plaintiffs' standing to bring their lawsuits. Because the parties had not addressed standing in their briefs, this court granted additional time for the parties to address the issue. However, before this court issued its Opinion and Order, the Secretary published final rules for the six species. Subsequently, this court issued its Opinion and Order, recognizing that though plaintiffs had prevailed on the standing issue, their consolidated motion for summary judgment had become moot due to the Secretary's action. *See Klamath Siskiyou Wildlands Center v. Babbitt,* 2000 WL 236366 (D.Or. 2000).

Pursuant to the ESA, 16 USC § 1540(g)(4), plaintiffs now move this court for an award of attorney fees and costs in the amount of $19,670.64 (docket #37). For the reasons set forth below, this motion is granted in part and deferred in part.

### *DISCUSSION*

The Secretary opposes plaintiffs' request for attorney fees because: (1) plain-

tiffs did not play a material role in the listing process; and (2) their lawsuits did not substantially contribute to the goals of the ESA. In the event that this court finds an award of attorney fees justified, the Secretary also requests additional time so that the parties may attempt to settle the exact amount of the attorney fees award.

## I. *Success on the Merits of the Case*

■ The ESA provides that a district court "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." 16 USC § 1540(g)(4). In determining whether attorney fees should be awarded, the court must first consider whether a plaintiff is a prevailing party. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Parties are deemed to prevail for the purposes of an award of attorney fees if they "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.* A party need not prevail on every claim asserted or obtain all the relief requested in order to be considered for an award of attorney fees. *Sablan v. Dep't of Finance of the Commonwealth of the Northern Mariana Islands,* 856 F.2d 1317, 1324 (9th Cir.1988). "Indeed, no judicial relief or consent decree is required as long as a plaintiff's suit has 'prompted defendants to take action to satisfy [its] demands.'" *Id.,* quoting *Harris v. McCarthy,* 790 F.2d 753, 759 (9th Cir.1986).

■ A party seeking attorney fees must establish a clear, causal relationship between the lawsuit and the outcome realized. "Phrased in equivalent terms, the party must show that his lawsuit acted as a catalyst which prompted the opposing party to take action." *Oregon Natural Resource Council v. Turner,* 863 F.Supp. 1277, 1281 (D.Or.1994). Here, whether the plaintiffs' lawsuit was a catalyst that prompted the Secretary to take action bifurcates into a two-prong inquiry. "First, it must be determined what the party sought to accomplish in bringing his law-

suit and then whether the lawsuit was causally linked to the relief actually obtained." *Id.* "Second, there must be a legal basis for the party's claim – it must not be frivolous, unreasonable or groundless." *Id.*

### A. *First Prong—Causal Relationship*

■ In order to satisfy the first prong of the "catalyst test," the relief sought should be compared with the relief actually obtained. If it is of the same general type, then an assessment should be made whether there was a causal connection between the relief obtained and the lawsuit. *Id.* at 1281, citing *Sablan,* 856 F.2d at 1325. Here, plaintiffs filed suit in order to force the Secretary to make and publish final rules for six species which the Secretary subsequently did. Therefore, the relief sought was of the same general type as the relief actually obtained. The only remaining issue is whether there was a causal connection between the two. This inquiry is "nothing more than an inquiry into factual causation" and whether these litigants have shown a sufficient causal relationship between their lawsuit and the practical outcome realized "is a pragmatic factual inquiry for the district court." *Id.*

■ In *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 497 (9th Cir. 1987), the Ninth Circuit rejected a "but for" test for causation, explaining that when a case ends before a final judgment is reached, a party may be deemed a prevailing party if it establishes "some sort" of clear causal relationship between the litigation brought and the practical outcome realized. "Hence, we have applied a test that inquires whether the suit was 'at least a material factor' or played a 'catalytic role' in bringing about the desired result. At a minimum, the lawsuit must have been a catalyst that prompted the opposing party to take action." *Id.,* quoting *McQuiston v. Marsh,* 707 F.2d 1082, 1085 (9th Cir.1983).

Determining whether a plaintiff's lawsuit served as a catalyst for a defendant's

actions is not always a simple task. In *Sablan,* the Ninth Circuit advised that "[c]lues to the provocative effects of plaintiffs' legal efforts are often best gleaned from the chronology of events; defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways." *Sablan,* 856 F.2d at 1326. Therefore, in order to assess the impact of plaintiffs' lawsuits, this court must explore the chronology of events surrounding the listing decisions in this case.

### 1. *Chronological History of the Listing Decisions*

#### a. *Gentner's Fritillary*

The Secretary first published a proposed rule to list the Gentner's fritillary as an endangered species on March 23, 1998. The Oregon Field Office of the Fish and Wildlife Service ("Service")[1] submitted a draft final rule for the listing to the Regional Office on January 6, 1999. On or about May 26, 1999, plaintiffs sent the Secretary a 60–day Notice of Intent to Sue ("NOI"). By August 6, 1999, the Regional Office submitted the draft final determination to the Washington, D.C., Office. Plaintiffs did not receive a response to their NOI and filed their Complaint two weeks later on August 20, 1999. On October 18, 1999, plaintiffs filed their Amended Motion for Summary Judgment and on November 15, 1999, the Secretary filed its opposition and requested a stay. The Director made a final decision for the species on November 2, 1999, and the final rule was published in the Federal Register on December 10, 1999, nearly 21 months after publication of the proposed rule.

#### b. *Willamette Daisy, Fender's Blue Butterfly, and Kincaid's Lupine*

The Secretary published a proposed rule to list the Willamette daisy, Fender's blue butterfly, and Kincaid's lupine on January 27, 1998. The Oregon Field Office submit-

ted a draft final rule to the Regional Office on December 23, 1998. On or about May 26, 1999, plaintiffs sent a NOI to the Secretary and, not having received a response to the NOI, filed their Complaint on August 20, 1999. The draft final rule was forwarded to the Washington, D.C., Office on October 15, 1999, five days before plaintiffs filed their Amended Motion for Summary Judgment on October 20, 1999. The Director signed the final rule on January 5, 2000, and it was published in the Federal Register on January 25, 2000, 24 months after publication of the proposed rule.

#### c. *Rough Popcornflower*

The Secretary published a proposed rule to list the Rough popcornflower on January 22, 1998 and the Oregon Field Office sent a draft final rule to the Regional Office on November 23, 1998. Plaintiffs sent a NOI to the Secretary on or about May 26, 1999. Two days later, the Regional Office forwarded the draft rule to the Washington, D.C., Office on May 28, 1999. Having received no response to the NOI, plaintiffs then filed their Complaint on August 20, 1999, and their Amended Motion for Summary Judgment on October 20, 1999. The Director signed the final rule on November 30, 1999, and it was published in the Federal Register on January 25, 2000, 24 months after publication of the proposed rule.

#### d. *Yreka Phlox*

The Secretary published a proposed rule to list the Yreka phlox on April 1, 1998. Plaintiffs sent a NOI to the Secretary on or about May 17, 1999, and, after receiving no response, filed their Complaint on July 20, 1999. The Sacramento Field Office submitted a draft final rule to the Regional Office on September 13, 1999, and plaintiffs filed their Amended Motion for Summary Judgment on or about October 20, 1999. The Director signed the final rule

---

**1.** The Service is the agency within the Department of the Interior with delegated authority to implement the ESA.

on January 13, 2000, which was published in the Federal Register on February 3, 2000, 21 months after publication of the proposed rule.

## 2. Analysis of the Chronological History

Plaintiffs contend that their lawsuits inspired the Secretary to expedite the publication of final rules for these species. In support of this proposition, they assert that if the NOIs, lawsuits, and Motions for Summary Judgment had not influenced the listing decisions, then the Service would have processed each species at a fairly uniform pace. Instead, the Service appears to have expedited the listing process for at least one of the six species and may have expedited the process for the others as well.

The Secretary responds that the timing of the Service's actions was dictated solely by fiscal and staffing constraints unrelated to the lawsuits. The Service had already commenced work on the draft final rules for each of the six species and had done much of the necessary work well before receiving plaintiffs' NOIs and Complaints. Indeed, the Service had completed and forwarded to the Regional Office the draft final rules for five of the six species before it received a NOI from plaintiffs. Thus, the Secretary asserts that plaintiffs' lawsuits did not cause it to publish the final regulations more quickly than would otherwise have been the case. According to the Declaration of Jamie Rappaport Clark ("Clark"), Director of the Service, the Service did not accelerate the listing process for any of these species due to this litigation.

While plaintiffs' evidence is not overwhelming, this court's review of the chronology reveals that the Service did not act uniformly with regards to all of these species. The Service proposed listing all the species within a two-month period in early 1998. The Service then sent five of the six species to the Regional Office within a two-month period in late 1998 and early 1999 before plaintiffs filed their lawsuits. The Service did not send the sixth species, the

Yreka phlox, to the Regional Office, however, until September 1999. The Director signed all of the proposed final rules within approximately two months in late 1999 and early 2000 after plaintiffs filed their lawsuits. For five of the species, the time elapsed from receipt by the Regional Office to signing by the Director ranged from 10–14 months. The Service therefore evidently expedited the process for the Yreka phlox, as the Director signed the final rule for this species only four months after it was sent to the Regional Office. The Secretary has not explained why it took 10–14 months for five of the six species, but only four months for the sixth species (the Yreka phlox) to move from the Regional Office to the Director's signature.

While the Service's expedited treatment of the Yreka phlox is apparent, its treatment of the remaining five species is less immediately suspicious. The Secretary, however, has failed to provide this court with any evidence as to whether these five species were processed to the publication stage faster or slower than similarly situated species not subject to litigation. Instead, the evidence presented to this court leads to a reasonable inference that the Secretary manipulated the process for all six species. This court heard oral arguments on plaintiffs' Motions for Summary Judgment on December 6, 1999. By that time, the Director had signed final rules for two species. Due to the Secretary's new argument concerning standing, this court permitted the plaintiffs to supplement the record and ordered the Secretary to submit its motion on standing by December 29, 1999. Plaintiffs' response was due January 12, 2000, and the Secretary's reply was due January 22, 2000. Coincidentally, the Director signed final rules for the remaining four species in the first two weeks of January 2000, while the motion on standing was pending.

The Secretary does not explain how all the final rules were signed within a two-month period surrounding oral argument on plaintiffs' Motions for Summary Judg-

ment. This court recognizes that the convergence in this case of the court dates and the Secretary's actions may be merely coincidental, but the Secretary has not submitted any specific evidence in that regard.

Furthermore, plaintiffs have submitted evidence casting doubt on the Secretary's general protestation that the timetable for publication of the rules was driven by budgetary constraints and staffing limitations and not plaintiffs' lawsuits. On March 7, 2000, the Service issued its "Listing Allocations for FY 2000" in a memorandum from Clark addressed to all Regional Directors. Plaintiffs' Exhibit ("Ex") 3. The memorandum stated that due to budgetary constraints, some types of actions would be deferred but that the available funding would cover, in the following order:

1) court-ordered actions, settlement agreements, and actions for which a date was given in a declaration;

2) emergency listings;

3) due or overdue final determinations;

4) deferred critical habitat designations and prudency determinations for previously not determinable findings greater than 12 months old;

5) new proposed listing rules; and

6) petition findings.

*Id.* at 1.

This memorandum makes clear that citizen suits do influence the Secretary's actions under the ESA, since "court-ordered actions, settlement agreements, and actions for which a date was given in a declaration" are at the top of the list of funded actions. This case does not fit within that specific category because this court did not order any action, the parties did not reach a settlement, and the Secretary did not promise a listing date in a declaration. However, the Secretary avoided an actual decision that he violated the ESA and an order to comply only because his belated standing argument delayed this court's decision.

Furthermore, this memorandum makes clear that the Secretary's actions are guided not only by court orders, settlement agreements, and dates given in a declaration, but also by on-going litigation. Clark (who appears to have signed this memorandum in her capacity as Director of the Service) writes in the same memorandum that "because of the limited funding and the large number of court-ordered listing actions that must be completed this year, we have generally restricted the new proposals that will be completed in FY 2000 to those candidates with a listing priority of 2 or less *or those in litigation." Id.* at 2 (emphasis added).

Plaintiffs point to similar statements made by Clark that indicate the Service's responsiveness to litigation. For example, although Clark expressly stated that the listing decisions in this case were not motivated by plaintiffs' lawsuits, first declaration states that the estimated listing completion dates for the six species "take[ ] into account the necessity of complying with existing court orders." Clark also acknowledged in another ESA case that "the majority of the listing packages that the Regional Office was able to process were actions taken in response to litigation or pursuant to a court order or settlement agreement." Plaintiffs' Ex 8, p. 2.

In support of his position, the Secretary submits three unpublished district court decisions denying attorney fees to plaintiffs under the ESA. These cases are nonbinding and distinguishable. In *Restore: The North Woods v. Babbit,* No. 97–10759–ML W, slip op. at 8–13 (D Mass Aug. 20, 1998) the Service introduced sufficient evidence to rebut the inferences raised by the chronology, such as evidence of a funding moratorium and of a subsequent plan for the species at issue. In addition, the plaintiffs proceeded with the lawsuit after being advised by the Service that it was on the verge of taking action. *Id.* at 11 ("Significantly, before they filed suit, plaintiffs were told of the FWS's work and progress on the petition"). Here, the Secretary has neither presented any satisfactory evidence to explain the inferences raised by

the chronology nor presented evidence of a pre-litigation plan for these species.

In addition, the Secretary ignored plaintiffs' numerous attempts at communication and settlement. He did not respond to any of plaintiffs' NOIs sent in May 1999. Subsequently, plaintiffs' attorney wrote to the Secretary three additional times, once prior to filing suit and twice prior to filing motions for summary judgment, proposing settlement of the cases and proposing that plaintiffs and the Secretary arrive at some mutually-acceptable listing dates without further litigation. Second Declaration of Marianne Dugan, ¶ 7. The Secretary also did not respond to any of these letters either. *Id.*

In *Biodiversity Legal Foundation v. Babbitt*, No. 96–B–2951, slip op. at 9–11 (D. Colo. Sept. 21, 1999), the court stated that the "declarations, letters from the agency, and Federal Register all show that the Defendants were acting in accordance with an established plan." Again, the court's decision depended on the evidence submitted by the Service that refuted any inferences raised by the chronology. As explained above, the Secretary has not rebutted the inference that arises from the chronology here.

Lastly, in *Southwest Center for Biological et al. v. Babbitt*, slip op. at 7–9, 108 F.Supp.2d 1209, —— – —— (D.N.M.2000), the court found that the chronological evidence was rebutted by sufficient and credible evidence that the funding moratorium and other fiscal restraints had influenced the process. Here, the Secretary has not presented sufficient evidence to rebut the presumption raised by the chronology that his actions were in part guided by the exigencies of litigation.

### 3. *Additional Evidence and Equitable Concerns*

▮ Chronological events are an important, though not definitive, factor in determining whether or not a defendant can be reasonably inferred to have guided his ac-

tions in response to plaintiff's lawsuit and a district court can consider other factors in determining if a causal relationship existed. *Braafladt v. Board of Governors of Or. State Bar Ass'n*, 778 F.2d 1442, 1444 (9th Cir.1985). This court, moreover, is mindful that "defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways." *Posada v. Lamb County*, 716 F.2d 1066, 1072 (5th Cir.1983).

▮ Plaintiffs argue that almost no Region 1 (which includes the State of Oregon) species has been listed under the ESA in the absence of citizen litigation or at least a NOI letter. They submit a six-page list prepared by the Service which shows all final listing determinations from April 1996, when the Congressional moratorium was lifted, through August 1998.[2] Plaintiffs' Ex 2. This list reveals that only three out of 36 species groups in Region 1 were listed under the ESA without some sort of litigation, excluding individual non-litigated species which were part of litigated multi-species listing decisions. *Id.* The Secretary finalized the first of these listing decisions, concerning "2 Santa Cruz insects," after a delay of almost three years. *See* 62 Fed Reg 3616 (1997). The Secretary expedited as an "emergency rule" the second listing decision concerning the San Bernardino kangaroo rat. One other listing decision made without litigation involves the Golden Paintbrush, which was listed in June 1997. Plaintiffs' Ex 2, p. 6. In addition to the Service's list, plaintiffs submit the testimony of Jay Tutchton, an attorney who has litigated ESA suits over missed deadlines involving at least 65 species. He states that in each such case, the Service has taken the sought-after action only after being sued. Declaration of Jay Tutchton, p. 3. Considered together, the evidence supports a reasonable inference that in a general sense, the Secretary's actions are substantially influenced by litigation. Indeed, the evidence seems to indicate that those who wish to champion a

**2.** Neither party has introduced evidence con- cerning more recent listing decisions.

certain "at-risk" species would do well to file a lawsuit.

While plaintiffs have presented this court with evidence sufficient to support their position, of equal importance is the evidence that the Secretary has failed to submit. If the Secretary had provided this court with evidence that the Service had a listing plan or timetable in place for these six species before receiving notice of a lawsuit, and that such a timetable was followed, then the Secretary might persuade this court that his actions were not in response to this litigation. The Secretary, however, has not provided any such timetable, and has not even argued that it had any timetable for these species prior to plaintiffs' lawsuits. Instead, from the evidence before this court, the Secretary first formulated an estimated completion date for these species when responding to plaintiffs' Motions for Summary Judgment.

 Plaintiffs additionally argue that this court should award them attorney fees in order to promote equity and further the purposes of the ESA. If the Secretary can avoid paying fees by delaying the issuance of a clearly warranted court order, and causing lawsuits to become moot during the period of delay, then citizen plaintiffs would be discouraged from filing suits at all. This court was prepared to rule at the time of the December 1999 hearing that the Secretary was in violation of the law. Instead, the Secretary belatedly raised a standing objection, forcing a substantial delay while the parties submitted additional briefings and the Secretary signed and published the final rules. The Secretary's manipulation of the timing of this court's decision should not exempt it from now paying plaintiffs' attorney fees. As the Second Circuit explained with regards to the Equal Access to Justice Act:

> By awarding fees to parties prevailing in litigation against the government, Congress intended to reduce the likelihood that challenges to bureaucratic action would be deterred by the high cost of litigating, particularly given the enormous resources at the government's dis-

> posal.... Clearly, the government can make lawsuits costly and burdensome to private parties by means of ... dilatory trial tactics.

*Environmental Defense Fund v. Watt,* 722 F.2d 1081, 1086 (2nd Cir.1983).

In fact, throughout this litigation, the Secretary's conduct has been less than exemplary by ignoring plaintiffs' settlement attempts. Plaintiffs' counsel attests that at the time of her first settlement proposal in July 1999, she had spent only 3.16 hours on the case. Even at the time of her final settlement offer in September 1999, plaintiffs' counsel had spent only 15.21 hours on the case. Since the Secretary admitted liability, settlement of this case at an early stage would have been relatively inexpensive and would have served the interests of both parties and the public. Instead, the Secretary chose to litigate the matter, making settlement progressively more difficult and increasing costs, especially by belatedly raising the standing issue. This type of conduct neither instills confidence in the Secretary's adherence to the law nor furthers the goals of the ESA. To deny attorney fees and allow the Secretary now to reap the benefit of its untoward conduct would undermine the very purpose of the ESA citizen suit provision.

This court is not unsympathetic to the plight of the Secretary in implementing and enforcing the ESA and understands that budgetary limitations constrain the Secretary's ability to do the work entrusted to the Service. Citizen lawsuits appear to determine the priority of the listing decisions undertaken by the Secretary, and the process as a whole appears to have devolved into a litigation-driven waste of resources for both plaintiffs and the government. Nonetheless, this court's sympathy cannot blind this court to the fact that plaintiffs' lawsuits seemingly spurred the Secretary to complete the listing process for the six species. Thus, plaintiffs are entitled to their attorney fees.

### B. Second Prong—Legal Basis for the Claim

The second prong of the catalyst test involves an assessment of the legal basis for plaintiffs' claim. Here, the Secretary does not dispute this legal prong of the catalyst test; that a final determination on the proposed rules for these species was required by law. Therefore, plaintiffs have successfully satisfied both prongs of the catalyst test and have demonstrated that for purposes of this attorney fees award, they are prevailing parties.

### II. Substantial Contribution to the Goals of the ESA

■ The Secretary lastly contends that plaintiffs have to demonstrate that not only were they a catalyst for the listing decisions in this case, but also made a "substantial contribution" to the purposes of the ESA, citing *Carson–Truckee Water Conservancy Dist. v. Secretary,* 748 F.2d 523, 525–26 (9th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 497(1985). Although the Ninth Circuit recently overruled *Carson–Truckee,* the Secretary contends that it did so only with respect to the standard by which a prevailing *defendant* can recover attorney fees. *Marbled Murrelet v. Babbitt,* 182 F.3d 1091, 1094–96 (9th Cir.), *cert. denied sub nom. Pacific Lumber Co. v. Marbled Murrelet,* —— U.S. ——, 120 S.Ct. 933, 145 L.Ed.2d 812 (2000). The Secretary thus argues that the *Carson–Truckee* rule still applies to plaintiffs seeking to recover attorney fees under the ESA. Plaintiffs respond that the *Carson–Truckee* rule never applied to them in the first place and that even if it did, *Marbled Murrelet* has overruled it.

In *Carson–Truckee,* the Ninth Circuit denied attorney fees for an intervening party but quoted extensively from cases that applied that standard to the prevailing party, whether or not that prevailing party was a plaintiff or defendant. *See Carson–Truckee,* 748 F.2d at 525–26. *Carson–Truckee* itself did not differentiate between plaintiffs and defendants under the attorney fees provision of the ESA.

In *Marbled Murrelet,* the Ninth Circuit affirmed the denial of attorney fees to the prevailing defendant and explained that it would no longer follow the *Carson–Truckee* rule in regards to attorney fees under the ESA: "We will follow *Razore,* not *Carson–Truckee,* and now hold that the *Christiansburg* standard for prevailing defendants applies in this case." *Carson–Truckee's* holding that the "substantial contribution" standard applies to prevailing defendants in ESA suits is no longer good law. *Id.* at 1094–95.

Without deciding whether or not the *Carson–Truckee* rule ever applied to plaintiffs, the Ninth Circuit rejected the *reasoning* behind the decision in *Carson–Truckee:*

> Two years after *Carson–Truckee,* the Supreme Court indicated that attorney's fees provisions in environmental statutes with similar language and purpose as the attorney's fees provision in the Civil Rights Acts should be interpreted in the same was. *See Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).... In *Delaware Valley* ... the Court concluded that "[g]iven the common purpose of both § 304(d) and § 1988 to promote citizen enforcement of important federal policies, we find no reason not to interpret both provisions governing attorney's fees in the same manner." *Delaware Valley has thus essentially overruled the reasoning of our decision in Carson–Truckee.* Like § 304(d) of the CAA, § 11(g)(4) of the ESA is very similar to the civil rights attorney's fees provision. The ESA attorney's fees provision allows the award of attorney's fees "to any party, whenever the court determines such award is appropriate."

*Id.* at 1095 (emphasis added).

This explanation leads to the conclusion that any statement in *Carson–Truckee* premised on this same reasoning also is overruled. Thus, *Marbled Murrelet* overturns any requirement, if there is one, that

a plaintiff seeking attorney fees under the ESA need show that it has substantially contributed to the goals of the ESA.

Moreover, even if the *Carson–Truckee* rule applied to the plaintiffs in this case, they have substantially contributed to the goals of the ESA. Their lawsuits served as a catalyst for the protection of six species, and have undoubtedly impressed upon the Service the need to respect the mandatory deadlines imposed by the ESA.

### III. *Bifurcation*

 In the event this court awards attorney fees to plaintiffs, the Secretary requests additional time to negotiate with plaintiffs as to the amount of the attorney fee award. Plaintiffs object to this request to bifurcate the action, asserting that the Secretary did not confer as required by Local Rule 7.1(a)(1). In addition, plaintiffs argue that bifurcation would waste the resources of the court and the parties and would increase the amount of fees ultimately awarded.

This court disagrees with plaintiffs. The Secretary has not yet addressed the particulars of plaintiffs' attorney fees request in a justifiable attempt to reduce fees. In order to give the Secretary an opportunity to respond to the hourly rates and number of hours requested by plaintiffs, this court will defer its decision on the amount of the attorney fees to award.

### ORDER

Plaintiffs' Motion for Award of Attorney Fees and Costs (docket # 37) is GRANTED in part and DEFERRED in part. Plaintiffs are entitled to an award of attorney fees under the ESA. The parties shall confer within the next 30 days in an attempt to agree upon an acceptable attorney fee award. If the parties are unable to agree, the Secretary shall submit a supplemental response by July 12, 2000, addressing only the amount of attorney fees claimed by plaintiffs. Plaintiffs shall sub-

mit a supplemental reply, if necessary, by July 26, 2000.